We will hear argument this morning in Case 24-A-884, Trump v. CASA, Inc., and the Consolidated Cases. General Sauer. Mr. Chief Justice, and may it please the Court. On January 20, 2025, President Trump issued Executive Order 14-160, Protecting the Meaning and Value of American Citizenship. This order reflects the original meaning of the 14th Amendment, which guaranteed citizenship to the children of former slaves, not to illegal aliens or temporary visitors. Multiple district courts promptly issued nationwide or universal injunctions blocking this order, and a cascade of such universal injunctions followed. Since January 20, district courts have now issued 40 universal injunctions against the federal government, including 35 from the same five judicial districts. This is a bipartisan problem that has now spanned the last five presidential administrations. Universal injunctions exceed the judicial power granted in Article III, which exists only to address the injury to the complaining party. They transgress the traditional bounds of equitable authority, and they create a host of practical problems. Such injunctions prevent the percolation of novel and difficult legal questions. They encourage rampant forum shopping. They require judges to make rushed, high-stakes, low-information decisions. They circumvent Rule 23 by offering all the benefits but none of the burdens of class certification. They operate asymmetrically, forcing the government to win everywhere, while the plaintiffs can win anywhere. They invert the ordinary hierarchy of appellate review. They create the ongoing risk of conflicting judgments. They increase the pressures on this court's emergency docket. They create what Justice Powell described as repeated and essentially head-on confrontations between the life-tenured and representative branches of government. And they disrupt the Constitution's careful balancing of the separation of powers. I welcome the court's questions. General Sauer, these universal injunctions, as you say, have proliferated over the last three decades or so. Would you discuss, though, the origins of universal injunctions? In particular, I'm interested in sort of historical analogs or the historical pedigree, particularly the Bill of Peace that was proffered by respondents. Yes, Justice Thomas. As you, I think, first pointed out in your separate opinion in Trump against Hawaii, the Bill of Peace is something very distinct from a universal injunction. So the Bill of Peace involved a resolution of a small, discrete set of claims of a small, discrete group. And even more fundamentally, it was binding on the members of that class and those represented by the class. So it's much more analogous to a modern class action under Rule 23. And in fact, as we've argued in other cases and as this court has described in opinions like Ortiz, the Bill of Peace evolved into and is directly developed into, so to speak, the modern class action that has all the same features of a Bill of Peace. So in the words of Chief Judge Sutton in the Sixth Circuit, the Bill of Peace was a domesticated animal that looks nothing like the dragon of a universal injunction. I'm sorry. Here. Go ahead. Here, there's a discrete identified group on one issue. Does citizenship mean are you born in the territory of the United States or does it mean are you loyal to someone else, which is your claim, or are your parents loyal to someone else? So that's no different than what happened in a peace, in a Bill of Peace. The United States is bigger, so it extends more broadly, but it's still an identifiable group on a discrete, singular question. Your Honor, I'd say three things in response to that. First of all, our primary contention is that the citizenship clause related to the children of former slaves, not to illegal aliens who weren't even present as a discrete class at that time, but more fundamentally here as to the issue of the Bill of Peace. There are critical differences. The Bill of Peace was a binding judgment that would bind absent class members. Here we have the... Well, here, class actions don't bind anyone who opts out, so class actions are not like bills of peace. I would think that a Rule 23b2 class action, which would be the relevant analog here, would be one that would be binding on absent class members and would not have the same notice of opt-out procedures, and more fundamentally, that sort of argument that there's a commonality here among all the people who purport to be affected by this is the sort of argument that's made in class certification. So can I ask you a question? Your theory here is arguing that Article III and principles of equity both prohibit federal courts from issuing universal injunctions. Do I have your argument correct? We argue both of those. You argue both of those. If that's true, that means even the Supreme Court doesn't have that power. The Supreme Court would have the authority to issue binding precedent nationwide, but as a court... But we couldn't enforce it against universally, is your argument. If there was a decision that violated the precedent of the court, then the affected plaintiffs could get a separate judgment. And that is what this court... And that means you're talking about the hundreds and thousands of people who weren't part of the judgment of the court, they would all have to file individual actions? Not necessarily. Or a class action? Class action would be... That makes no sense whatsoever. Respectfully, we believe that. What was the purpose of the Bill of Peace if not to settle a legal question finally? And if even the Supreme Court doesn't have that right and must invite hundreds of thousands of lawsuits, what are we buying into? If a set of claims satisfies the rigorous criteria of Rule 23, Rule 23 is the modern analog of a Bill of Peace. We have something very different here. No, we don't, because the argument here is that the president is violating not just one, but by my count, four established Supreme Court presidents. We have the one arc case where we said fealty to a foreign sovereign doesn't defeat your entitlement, your parents' fealty to a foreign sovereign doesn't defeat your entitlement to citizenship as a child. We have another case where we said that even if your parents are here illegally, if you're born here, you're a citizen. We have yet another case that says even if your parents came here and were stopped at the border, but you were born in our territory, you're still a citizen. And we have another case that says even if your parents secured citizenship illegally, you're still a citizen. So as far as I see it, this order violates four Supreme Court presidents, and you are claiming that not just the Supreme Court, that both the Supreme Court and no lower court can stop an executive from universally, from violating that holding, those holdings by this court. We are not claiming that because we're conceding that there could be an inappropriate case. Only in class. Can I hear the rest of his answer? A Rule 23 class action. And then the more fundamental point as to all those Supreme Court decisions you refer  So what do we do temporarily? Temporarily, the lower courts may issue injunctions that remediate the injuries to the plaintiffs that appear before them. Lower courts, inappropriate cases may certify. So when a new president orders that because there's so much gun violence going on in the country, and he comes in and he says, I have the right to take away the guns from everyone. Then people, and he sends out the military to seize everyone's guns. We and the courts have to sit back and wait until every named plaintiff gets or every plaintiff whose gun is taken comes into court. In appropriate cases, courts have certified class actions on an emergency basis. We found at least four cases in recent years where that was done. But more fundamentally, we profoundly disagree with the characterization of the merits. This is now fully briefed in the Ninth Circuit in case number 25-807, where we describe how that characterization of the holding of Wong Kim Ark and the other decisions is profoundly incorrect. Counsel, could I ask you about a different type of case that has broader impact than the particular claimant? Like a claimant who's alleging that the districting in a particular case has resulted in racial discrimination against him or her based on how the district is drawn. Now a judicial decision about that one plaintiff would implicate the redistricting throughout the whole case, so throughout the whole state. How does your theory address that situation? That would be what you might call an indivisible remedy, where what the court is doing there by, for example, redrawing the district lines is, as this court said in Gill against Whitford, the only way to remediate the injury of voting in an unconstitutionally drawn district. That is similar to abatement of a public nuisance or, for example, in the school desegregation cases, where remediating the injury to the plaintiff before the court necessarily has collateral consequences to many others, and certain environmental cases might have a similar thing. So if, for example, you stop the local plant from pouring water pollution into the water, that benefits the plaintiff. It happens to benefit a bunch of other people. Now that's very different than what we have in these universal injunctions, where it is a divisible remedy. I mean, I point to the holding of the District of Massachusetts in this case, looking at the individual plaintiffs. That court said, well, obviously, I don't have to give a universal injunction to protect individuals other than the individual plaintiffs. They are given complete relief by an injunction that tells federal officials only to treat their children as defendants. I guess the question is, why does the law require that? I mean, I appreciate that a court could, in a divisible remedy kind of case, narrow in to the plaintiff, but you seem to be suggesting that Article III or Rule 23 or something requires that, and I guess I don't really understand it. If I may offer two responses to that. In the Article III context, that is the principle announced in Worth v. Selden, announced in Will v. Whitford, and Lewis v. Casey, where this court has said again and again, what we do in the Article III context is grant remedies that are tailored to remove the injury to the complaining plaintiff. Sometimes they have even very broad collateral consequences. But in the Article III context, what the court has not done, and every time, it's focused on this in National Treasuries Union, Employees Union, in the Perkins case. I don't see why then the divisible remedies or indivisible remedies is an argument. I mean, if Article III is suggesting that the court has to focus in on the plaintiff only, then it would seem to me that that would be the power requirement across the board. I thought Article III was really about limiting the court's power with respect to jurisdiction, that we say the court has to determine whether or not there's subject matter jurisdiction over the issue, and whether or not there's personal jurisdiction over the defendant. And once you have those things, the court can evaluate the merits of the legal issue, and issue, especially in equity, appropriate relief. Now, I appreciate that there are some prudential concerns that the court considers, but it's seems to me that in many, many, many circumstances, we have not required the court to limit their relief to the particular plaintiff as a matter of constitutional Article III requirement. I disagree with that, and I'd offer a response both first as to Article III, and then as to the scope of equitable authority. In the Article III context, this court said in Worth v. Selden, for example, that the Article III judicial power exists only to redress the injury to the complaining parties. Again, in Gill v. Whitford, and Lewis v. Cato... All right, so let me give you a hypothetical. So suppose we have a manufacturing plant that unlawfully releases environmental toxins into the air, and we have a plaintiff who lives near the plant, brings a nuisance lawsuit, and says they're being harmed by unlawful release. Your argument suggests that the judgment for the plaintiff has to narrow in on preventing, to the extent possible, preventing harm to the plaintiff. But it seems to me that that's not necessarily the case. You suggest with the Chief Justice in response to him that there can be incidental beneficiaries, that the court could say no more toxins if it's unlawful for the defendant to do that, correct? Yes, we do. So why? Why, if your Article III principle is correct? Because, again, the Article III principle is remedying the injury to the plaintiff, or a set of plaintiffs, could be many, who are before the court. That has collateral consequences, and that could help. Counselor, let me ask you on that point, would one distinction be who's bound by the judgment? Like, I'm wondering whether if the plaintiff needs, you can only, I think Judge Strauss said, in the 8th Circuit when addressing this issue, you can't peel off part of a nuisance, so the whole thing has to be shut down. Could a neighbor sue affirmatively to hold the nuisance maker in contempt if he started to re-begin, you know, begin again the nuisance? That's a great point. It would not be bounding on those collaterally benefited parties, so to speak. I don't want to call them parties, because they're not parties before the court. And that, of course, highlights one of the deep problems with the U.S. But why would you have to do that? Well, could you do that now for the universal injunction? Could a plaintiff, for example, who has the protection of the universal injunction but was not named in the suit bring a contempt action of the sort I just described? They could not do that. But what they could do is run to any of 93 other judicial districts and bring their own lawsuit. No, no, no. Under the injunction as it stands, under the injunctions as they stand, could a non-named plaintiff who has the benefit of the universal injunction that's currently in place, could that plaintiff bring a contempt proceeding? Or I guess I shouldn't call them a plaintiff. We would dispute that they would have the standing to do that, because it goes to the heart of the problem. Well, no, no, no. Let's see. Maybe I'm not being clear. Assume the universal injunction is good. Like, drop your argument right now. Oh, I see. As they currently stand, could someone who is not named in the suit but a beneficiary bring a contempt proceeding? I think that that is what the respondents would certainly contend. Do you concede that the plaintiffs could bring a Rule 23, like the individual plaintiffs? We would dispute. I mean, we'd have to address the Rule 23 issues, kind of, all the criteria as they came up. Okay, but they could seek it. Okay, and then last question. Okay, just last question on this point. The states have a different kind of claim for financial harm, and they've pointed out that it would be very difficult to remedy that without some sort of broader relief. I know you contest their standing. I want you to assume that I think they have standing. Why wouldn't they be entitled to an injunction of the scope of the one that has currently been entered? I would say two reasons. First of all, it's not necessary to provide complete relief to the plaintiffs. What we offered, for example, in the District of Massachusetts in the First Circuit was an injunction that would enjoin the federal officials and order them to treat the people who would otherwise be covered by the executive order as eligible for the services that resulted in the pocketbook injuries to the states. And there's really no response to that. That is obviously, would fully remediate their injuries and does not require the injunction to be applied in all other 50 states. One state comes in and says, well, people are going to move across state lines. Therefore, we've got 21 states in this case who don't want this relief. Sorry, you've got to impose it on everybody because it has to be offered to this one particular state. So that's one response. The other response is this notion that the states have to be provided a complete relief because of interstate travel and patchwork. I think that's very effectively responded to by Chief Judge Sutton's opinion in the Second Circuit where he says, this is a problem. If we adopt this logic, it justifies universal injunction in every single case. And that can't be the case. Fifth Circuit's recent DACA decision comes to the same conclusion. What do you say, though, to the suggestion, General, that in this particular case, those patchwork problems for, frankly, the government as well as for plaintiffs justify broader relief? As to the government, again, Chief Judge Sutton addressed that directly as well when he said that's the federal government's problem. In other words, the federal government, for example, in the First Circuit, we offered that as a narrower scope of injunction. And the decision was, well, that would cause you too many administrative problems. And I think Chief Judge Sutton directly addresses that when he says that's a problem for the executive branch. That's your problem. All right. And then with respect to class certification, your friends on the other side point out that that takes time. And there are, as you've emphasized, hurdles that have to be met to achieve class certification. And the argument, of course, is that the injury is immediate and ongoing, and as Justice Sotomayor suggested, might be seriously questioned as to its compliance with this court's precedents. Your thoughts? I would offer a couple of things in response to that. First of all, there are tools for the courts have tools to achieve sort of class-wide universal relief. We found four recent district court decisions where class-wide relief was given on kind of an emergency basis. However, more fundamentally than that- And you agree that that's appropriate in certain cases? It may be appropriate. I do not concede that it's appropriate in this case, but it may be appropriate in other cases. Certainly, it's an equitable tool that is consistent with, for example, the grant of equitable authority in the 1789 Judiciary Act, as this court interpreted in the Grupo Mexicano decision, and honestly, a line of decisions going all the way back to the early 19th century. So there are tools to address emergency situations. But more fundamentally than that, it is a feature, not a bug, of Article III that courts grant relief to the people who sue in front of them. So the notion that relief has to be given to the whole world because others who have not taken the time to sue are not before the courts is something that results in all these problems. Last question. Do we need to reach the Article III question? I mean, wouldn't it be wise, even if you were to prevail, for the court to reserve that question rather than decide that Congress, for example, could never endow this court with that authority? That's exactly correct. The court does not have to rest on Article III because the court could say, and as we've argued and as Justice Thomas has a separate opinion in Trump against Hawaii says, the 1789 Judiciary Act, when it said suits and equity are what the federal courts can do, we had nothing like this in mind. And then I point to the language in Grupo Mexicano where the court said there was an issue was a preliminary injunction that froze and likely insolvent debtors' assets so that the plaintiff could collect at the end of the case. And the court said that's a nuclear weapon in the law and that had no analog in 1789 in the practices of the Court of Chancery. And if that's a nuclear weapon, I don't know what this is, where repeatedly, 40 times in this administration, we're being enjoined against the entire world. I'm just going to ask you to put yourself in a different frame of mind. It's hard to do, assume something you won't want to assume. But the assumption that I want you to make is that on the merits, which of course you did not take to this court, on the merits you are wrong, that the EO is unlawful. And I want to ask you, if we assume that, how do we get to that result on your view of the rules? It is very difficult for me to attempt the hypothetical, but I will. I think that that's the important question in this case. Let's just assume you're dead wrong. How do we get to that result? Does every single person that is affected by this EO have to bring their own suit? Are there alternatives? How long does it take? How do we get to the result that there is a single rule of citizenship that is the rule that we've historically applied, rather than the rule that the EO would have us do? Rule 23 would be one natural path, assuming that a class could be certified, which we might dispute in this particular case. Well, you might dispute it. I think the question is, is there a class that's just all children of people who have entered illegally? You know, is that an appropriate class? Can the same thing be done under Rule 23? Or are you going to tell me that, no, Rule 23 has lots of requirements, and you'll never be able to certify a class like that? Rule 23 provides the equitable tools subject to rigorous criteria, appropriately rigorous criteria, to obtain that kind of class-wide enumeration. That suggests to me you're going to be standing up here in the next case saying that Rule 23 is inept for this circumstance, with this number of people, maybe with some questions that are individual, who knows. So let's put Rule 23 aside, because I've got to tell you, that does not fill me with great confidence. How else are we going to get to the right result here, which is on my assumption that the EO is illegal? That would be a profoundly wrong result, but I think what I would offer is that, very similar to Labrador against Poe, what the court should be engaging here is a balancing of the equitable factors as to the scope of remedial relief, not as to the underlying merits, and our contention that this exceeds the traditional scope of equity that's reflected in the 1789 Judiciary Act. We're overwhelmingly likely to succeed on those merits for all the reasons that are stated in our case. Yes, I mean, that's a lot of words, and I don't have an answer. Therefore, if one thinks, and, you know, look, there are all kinds of abuses of nationwide injunctions, but I think that the question that this case presents is that if one thinks that it's quite clear that the EO is illegal, how does one get to that result, in what time frame, on your set of rules, without the possibility of a nationwide injunction? On this case, and on many similar cases, the appropriate way to do it is for there to be multiple lower courts considering it, the appropriate percolation that close to the lower courts, and then, ultimately, this court decides the merits in a nationwide binding precedent. You have a complete inversion of that through the nationwide injunctions with a district court. But, General Sauer, are you really going to answer Justice Kagan by saying there's no way to do this expeditiously? Well, I'll refer to my former answers. Rule 23 provides the tools to do so, multiple injunctions. But you resisted Justice Kagan when she said could the individual plaintiffs form a class? That has never been briefed in the court below. I do not concede that we wouldn't oppose class certification in this particular case. There may be arguments that this case is or is not appropriate for class certification. If there were a class appropriate for class certification, you concede that that could resolve the question quickly? Yes, absolutely. You concede it could resolve the question quickly through precedent? Yes, absolutely. It could do so. I mean, we obviously dispute that. Sorry to interrupt. Go ahead, please. All right. I've got a quick one. I'm just going to say just on that point, let's say that we're an individual person even. Let's say it wasn't a class. And goes up and gets a ruling from the Second Circuit that the EO was illegal. Does the government commit to not applying its EO in the entire Second Circuit? Or does it say, no, we can continue to apply the rule as to everybody else in the Second Circuit? I can't say as to this individual case. Generally, our practice is to respect circuit precedent within the circuit. Yes, it is generally your practice. And I'm asking whether it would be your practice in this case. I can't answer because it would depend on what the lower court decision said. So there are circumstances, as I was suggesting, where we think that we want to continue to litigate that in other district courts in the same circuit as well. Yes, so that means it's not even the normal time it takes for everything to get up, you know, through the circuit courts and to the Supreme Court. Because even in those circuits that say that the EO is illegal, you're going to be saying, no, you know, we only commit to saying it's illegal to this one guy who brought the suit. Article III and the court's traditional equitable practices provide a range of tools to address that, including potentially nationwide class action. Nationwide class action, which you say you're going to oppose when that gets challenged. We are likely to oppose. You know, proposed. Yes, and if it does not meet the rigorous criteria of class certification, the court should not enter that injunctive relief. If you think like that, you're not willing to commit to abiding by the Second Circuit's precedent. Suppose that there's a single person who brings a suit, and it gets all the way up to us after three or four or five years. And we say, you know, we really do agree with those four precedents that Justice Sotomayor started with, and your EO is illegal. Is that only going to bind the one guy who brought the suit? No, that would be a nationwide precedent that the government would respect. So finally, once it gets to us after four years, you're going to respect that. Yes, and in addition, we may well respect statewide precedent. The Second Circuit is just as— And for four years, there are going to be like an untold number of people who, according to all the law that this court has ever made, ought to be citizens who are not being treated as such. And in the meantime, any of those plaintiffs could have come forward and sought, you know, preliminary injunctive relief, and they could do so on a class-wide basis. There are tools to address this, but the universal injunction, which is issued here three days after the executive order was issued, is not one of those tools. Thank you, counsel. Three years, four years, we've been able to move much more expeditiously. I think we did the TikTok case in a month. Presuming—I gather an important part of your answer is that people can litigate differently, and one will go to Massachusetts, the other one will go to Houston, and you'll get conflicting decisions fairly quickly. Is there any reason why this court—and I gather that's your safety net, is that at the end of the day, after however long the day is, this court can issue a decision and it will bind everything else. Is there any reason in this particular litigation that we would be unable to act expeditiously? Absolutely not, Mr. Chief Justice. Okay, thank you. Justice Thomas? General, when were the first universal injunctions used? We believe that the best reading of that is what you said in Trump against Hawaii, which is that Warts, in 1963, was really the first universal injunction. There's a dispute about Perkins against Lucan's oil going back to 1940, and of course we point to the court's opinion that reversed that universal injunction issued by the D.C. Circuit and said it's profoundly wrong. Now, if you look at the cases that the other parties cite, you see a common theme. The cases that we cite, like National Treasuries, Treasuries Employment Union, Perkins against Lucan's oil, Frothingham and Massachusetts against Mellon, going back to Scott against Donald, and all of those, those are cases where the court considered and addressed the sort of universal, in that case statewide, issue of provision of injunctive relief. So when the court has considered and addressed this, it is consistently said you have to limit the remedy to the plaintiffs who are appearing in court and complaining of that remedy. So we survived until the 1960s without universal injunctions? That's exactly correct. In fact, those are very limited, very rare, even in the 1960s. It really exploded in 2007 in our petition in Summers against Earth Island Institute. We pointed out that the Ninth Circuit had started doing this in a whole bunch of cases involving environmental claims. Justice Alito? Thank you. You began by outlining what you see as the practical problems that have been created by universal injunctions. If we were to hold that the states have standing, and if it is possible for a plaintiff to get emergency certification of a class, would we, suppose we agreed with you on universal injunctions, but allow those other two avenues, would the practical problem be rectified to any substantial degree? Certainly if there were an injunction that extended to all of the litigating states, that would cover a very substantial portion of the country, and also an emergency sort of class certification decision might also grant very broad relief. So the answer is that the practical problem would not be solved, And if that's the case, what is the point of this argument about universal injunctions? I think the point is that universal injunctions exceed traditional principles of Article III, and they exceed the traditional equitable authority, and that's what yields all these sort of pathologies, so to speak, of the current practice of issuing them very, very easily. Thank you. Justice Sotomayor? You answered Justice Gorsuch, I think, correctly, that if Article III precludes universal injunctions, then even class actions are illegal. That's what you're arguing, isn't it? I disagree with that profoundly. How could it? If Article III only prohibits injunctions that affect non-members or non-plaintiffs, how could Congress give a remedy like a class action? In a Rule 23 class, every member, represented member of the class, has standing by hypothesis, so every single one of them has an Article III injury, and Rule 23, again, provides... So that would be the only method. It would be very similar to the Bill of Peace, where all those plaintiffs in their representative capacity are bound. We can act quickly. If we are worried about those thousands of children who are going to be born without citizenship papers that could render them stateless in some places because some of their parents' homes don't recognize children of their nationals, unless those children are born in their countries, they're not going to be receiving federal benefits, because that's the claim of the plaintiffs here, or the state plaintiffs, that they're not going to be able to provide services to those children. Shouldn't we grant cert before judgment on that issue? If we're afraid that this is, or even have a thought that this is unlawful executive action, that it is Congress who decides citizenship, not the executive, if we believe, some of us would believe that, why should we permit those countless others to be subject to what we think is an unlawful executive action? As unlawful as an executive taking the guns away from every citizen. Cert before judgment would be another tool through which this court could ask expeditiously... This is the kind of case where the equities would call for that. And why wouldn't it? It's a pure legal question. What does the Constitution mean with respect to citizenship? There are no individual facts that would alter our conclusion. If we can't do it by a universal injunction, because you say Article 3 doesn't permit that, Article 3 wouldn't permit us to give a universal injunction, even if we rule. Why don't we grant cert before judgment? So that all of these parents would have a firm Supreme Court decision that they can take where? Because you're saying nobody can grant a universal injunction. No party has asked for that in this case. And I think one reason is that would deny the court of the benefit of percolation in multiple lower courts of a novel... Right now we have multiple courts who have percolated this issue and said you're violating precedent. Not only precedent, but the plain meaning of the Constitution. Respectfully, I think what we have are lower courts making snap judgments on the merits that ignore the fundamental principle of the 14th Amendment that it was about giving citizenship to the children of slaves, not to the children of illegal immigrants, who really were not even a very discreet class at that time. There were some people in Congress who argued against the 13th Amendment just because of that. Some people who argued against passing the amendment just because of that, because it would give citizenship to gypsies. I think the relevant history of the 14th Amendment is the statements of Senator Trumbull who emphasized that domicile was the key criterion. He said that in a letter to Andrew Jackson, and there... And that was rejected repeatedly. We can go into the history of citizenship, but I still go back to my question. You claim that there is absolutely no constitutional way to stop, put this aside, to stop a president from an unconstitutional act, a clearly, indisputably unconstitutional act, taking every gun from every citizen. We couldn't stop that. I disagree with that for the reasons I've said, including the equitable tools. No, because you said to us we'd have to wait until there was a final judgment. You're not sure you would respect the judgment of every circuit. You're not sure that you would respect even a final judgment of this Supreme Court because it only binds the parties before it. And if there's no class action, that only binds the parties before the court. I don't think there's a, so to speak, really, really unconstitutional exception to the strictures of Article III or the scope of equitable authority, and the court should not recognize one because what we see, not just in this case, but in the 39 others, is that district courts who are issued these injunctions all passionately disagree with the thing that's being challenged in that. So that principle that, well, this we think is really unconstitutional, therefore we should ignore the general principles of Article III, is not a principle the court ought to adopt. Justice Kagan? So, General, on this question of expedition, I mean, it sort of depends on the government's own actions in a case like this one where one can expect that there is not going to be a great deal of disagreement among the lower courts. I mean, let's assume that you lose in the lower courts pretty uniformly, as you have been losing on this issue, and that you never take this question to us. I mean, I notice that you didn't take the substantive question to us. You only took the nationwide injunction question to us. I mean, why would you take the substantive question to us? You're losing a bunch of cases, this guy over here, this woman over here, you know, they'll have to be treated as citizens, but nobody else will. Why would you ever take this case to us? Well, in this particular case, we have deliberately not presented the merits to this court on the question of the scope of remedies, because, of course, that makes it a clean vehicle where the court doesn't have to look at. You're ignoring the import of my question. I'm suggesting that in a case in which the government is losing constantly, there's nobody else who's going to appeal. They're winning. It's up to you to decide whether to take this case to us. If I were in your shoes, there is no way I'd approach the Supreme Court with this case. So you just keep on losing in the lower courts, and what's supposed to happen to prevent that? Again, I respectfully disagree with that forecast of the merits, but in response to the question, what I would say is we have an adversarial system, and if the government is not, for example, not respecting circuit precedent on the court's hypothetical in the Second Circuit, someone injured in the Second Circuit could take the case up, and they could say, look, the government is violating circuit precedent on the hypothetical multiple circuits. That's the case we're going to take? Somebody who says, you know, after we've said that this all has to be done one by one by one, then we're going to take a case from somebody who objects to proceeding one by one by one? I'm not sure I understand the question. If you win this challenge and say there is no nationwide injunction and it all has to be through individual cases, then I can't see how an individual who is not, you know, being treated equivalently to the individual who brought the case would have any ability to bring the substantive question to us. They would bring a lawsuit in the federal district courts against the government for an injunction protecting them. And if the government wasn't respecting, you know, on the hypothetical circuit... Yeah, and then they win. And again, I mean, you need somebody to lose. But nobody's going to lose in this case. It's just you're going to have, like, individual by individual by individual, and all of those individuals are going to win, and the ones who can't afford to go to court, they're the ones who are going to lose. The tools that are provided to address hypotheticals like this, again, I... This is not a hypothetical. This is happening out there, right? Every court has ruled against you. We've only had snap judgments on the merits. Obviously, we're fully briefing the merits in the courts of appeals, and our arguments are compelling more fundamentally in response to the question. I'm suggesting to you, like, the real brunt of my question is in a case like this, the government has no incentive to bring this case to the Supreme Court because it's not really losing anything. It's losing a lot of individual cases which still allow it to enforce its E.O. against the vast majority of people to whom it applies. And again, Rule 23 provides an avenue to present to address those very concerns. Thank you. Justice Gorsuch? Well, Justice Kagan asked my questions better than I could have. How do you suggest we reach this case on the merits expeditiously? There is a number of tools the court could do that. We think this case is one that cries out for percolation, that the court should allow the lower courts to address the merits issue multiple times. It's currently on briefing in three different cases in the First, Fourth, and Ninth Circuits, and we think that that's the appropriate way to do it. If the court disagreed, obviously, Supreme Court judgment. When you lose one of those, do you intend to seek cert? If we lose, yes, absolutely. Justice Kavanaugh? So the technical problem here seems to be class-wide relief without the district courts going through the steps to assess whether a class should be certified, correct? Correct. Okay. And if you win here on this procedural point, it seems very likely that the day after, there are going to be suits filed all over the place seeking class-wide treatment, maybe statewide classes, circuit-wide classes, maybe nationwide classes. I'm sure they're being prepared now. And on what basis would you oppose a statewide class? I could imagine certain bases, and again, we haven't briefed this in the lower courts yet. You've been promising everyone here that Rule 23 is the cure-all, and I want to explore on what basis you would oppose a statewide class. Just take that one for now. For example, and again, this is very hypothetical because I'm not predicting that we will or will not oppose that. We haven't taken a position on that yet. If you were to oppose it, on what basis would you plausibly oppose it? There may be problems of commonality and typicality, for example. For example, there's two different sets of groups that are affected by the executive order. There are those where the mothers are temporarily present and those where the mother are illegally present, and in both cases the father is neither a citizen nor a lawful permanent resident. So there might be issues of typicality. Adequacy of representation might very well be an issue. So there would have to be that rigorous application of those criteria. Now, the argument may be this is a case that is a natural candidate for a Rule 23b2 certification. That may well be true. The government hasn't taken a position on that. Our position is not that class certification will necessarily be granted. Our position is that Rule 23 is how these sorts of claims should be channeled. And you think, I think you just said, it's very possible that class certification may be granted. It is possible. We don't know yet because there was a class certification motion filed at the very beginning in the Western District of Washington, and it was just never briefed because obviously the pathology here is that the nationwide injunctions just go blowing past the class certification procedures. And I guess Rule 23b2, for a lot of the cases we've had over the past 25 years that you talk about where there have been universal injunctions or the lower courts have had that. I mean, 23b2 could have been used in a lot of those presumably, correct? Eviction moratorium, student loans, OSHA vaccine mandate. Do you see the possibility that 23b2 could have been used instead of, I mean, some of those were APA, but put aside the APA issue for now. Yeah, we do set aside that issue, if I may. I got it. But, yes, I agree with that. As to some but not all the other cases, it's hard to see how, for example, Biden against Nebraska, where a state was a plaintiff, might have been a 23b2 class. And the Alabama Association of Realtors might have been a much better candidate for that. And, again, not taking a position on the individual merits, our overarching point is there's a tradition of equity in this country that goes back to the English Court of Chancery and what's happening in these universal injunctions. Again, 40 times in this administration, at least 22 times in the last administration, 64 times in the administration before that. It's just disregarding those appropriate procedures to seek this kind of global relief. I want to ask one thing about something in your brief. You said, quote, and, of course, this court's decisions constitute controlling precedent throughout the nation. If this court were to hold a challenge statute or policy unconstitutional, the government could not successfully enforce it against anyone, party or not, in light of stare decisis, end quote. Do you agree with that? Yes, we do. If you prevail here, the original executive order had a 30-day period before it took effect. If you prevail here, should there be any pause so that things can happen that need to happen for 30 days or some period of time, or should we not even worry about that? Yes, we can see that the 30-day ramp-up period that the executive order itself calls for never started because the universal TROs were entered almost immediately, and we don't disagree that there should be a 30-day ramp-up period for another reason as well, which is that we've been enjoined from even doing guidance, even formulating a policy, and that itself is another problem with these injunctions. On the day after it goes into effect, this is just a very practical question of how it's going to work. What do hospitals do with a newborn? What do states do with a newborn? I don't think they do anything different. What the executive order says in Section 2 is that federal officials do not accept documents that have the wrong designation of citizenship from people who are subject to the executive order. How are they going to know that? The states can continue to, the federal officials will have to figure that out. How? You can imagine a number of ways that the federal officials could. Such as? Such as they could require a showing of documentation, showing legal presence in the country. For a temporary visitor, for example, they could see whether they're on a B-1 visa, which would exclude the birthright citizenship and that kind of thing. For all the newborns, is that how it's going to work? Again, we don't know because the agencies were never given the opportunity to formulate the guidance. They're only going to have 30 days to do this. You think they can get it together in time? That's what the executive order instructs them to do, and hopefully they will do so. Again, it's a speculative and hypothetical scenario because they were enjoined from even starting that process. And then last question. You mentioned before this has come up in the last four or five administrations primarily. I guess I've thought about that a lot too. Why? It seems why might be it's harder to get legislation through Congress, particularly with the filibuster rule. Presidents want to get things done with good intentions. The executive branches that work for those presidents push hard when they can't get new authority to stretch or use existing authority, and they've been pushing, understandably, all with good intentions. All the presidents, both parties, right, with good intentions pushing. Is that your understanding of why this has happened more, that there's less ability to get legislation? Because I'm trying to figure out the why to your opening about the last four or five administrations. I agree with it. I think that might be the why, but I'm curious what you think. I'm speculating about the motivations of the individual district judges to grant these, but one explanation might be this is an extraordinary power. It's a very strong power for the reasons the questions have reflected. Let me just pause you right there. The underlying point is that these district judges are not just doing universal injunctions. They're finding these actions illegal because they're exceeding existing authority, and oftentimes we are too when it gets to us, finding the actions of presidents of both parties unlawful because they exceed existing authority. Is that coming up more often? Why is that coming up more often? It's hard to do an historical analysis, but I would draw an analogy to the New Deal, and Professor Bray makes this point in his article that actually there were very, very passionate challenges to nationwide policies during the Roosevelt administration, and they were not addressed by issuing universal injunctions. He cites an example where in one case a policy had been held illegal, and there were like 1,600 injunctions against that policy, all protecting the individual plaintiffs. So if you look at the history, it's not clear that what we have of disagreement, difficulty, gridlock, getting things through Congress and so forth, that's not necessarily new. What is new and is certainly unique to the last five presidential administrations is having these given on this widespread basis and this systematic basis, 40 again in the last four months. Thank you. Justice Barrett? General Sauer, I want to ask you about a potential tension. Well, no, not a potential tension, an actual tension that I see in answers that you gave to Justice Kavanaugh and Justice Kagan. You resisted Justice Kagan when she asked you whether the government would obey within the Second Circuit a precedent, distinguishing between opinions and judgments here. Did I understand you correctly to tell Justice Kagan that the government wanted to reserve its right to maybe not follow a Second Circuit precedent, say, in New York because you might disagree with the opinion? Our general practice is to respect those precedents. But there are circumstances when it is not a categorical practice, and that is not just a new policy. This administration's practice or the longstanding practice of the federal government? And I'm not talking about in the Fourth Circuit are you going to respect a Second Circuit. I'm talking about within the Second Circuit. And can you say is that this administration's practice or a longstanding one? As I understand it, longstanding policy of the Department of Justice. Yes, that we generally, as it was phrased to me, generally respect Circuit precedent, but not necessarily in every case. And some examples might be a situation where we're litigating to try and get that Circuit precedent overruled and so forth. Well, okay. So I'm not talking about a situation in which, you know, the Second Circuit has a case from 1955 and you think it's time for it to be challenged. That's not what I'm talking about. I'm talking about in this kind of situation. I'm talking about this week the Second Circuit holds that the executive order is unconstitutional, and then what do you do the next day or the next week? Generally, we follow that. So you're still saying generally? Yes. And you still think that it's generally the policy, longstanding policy of the federal government to take that approach? That is my understanding. Okay. So, but it sounds to me like you accept a Cooper v. Aaron kind of situation for the Supreme Court, but not for, say, the Second Circuit. Where you would respect the opinions and the judgments of the Supreme Court, and you're saying you would respect the judgment but not necessarily the opinion of a lower court. And, again, I think the vast majority of instances our practice has been to respect the opinion as well, in the Circuit as well, but my understanding is that has not been a categorical practice in the way respect for the precedents and the judgments of the Supreme Court has been. So you're not hedging at all with respect to the precedent of this Court? That is correct, I believe. The quotation from our application directly addresses that, and we stand by that completely.  Next question. So this is also a follow-up to some of the questions that others have asked you about the merits of the order not being before us. Did I understand your answer to be because you think percolation is really important for this one? We do think percolation is really important for this one, but the reason the merits are not before us is because we've only submitted a stay application on the scope of relief question, and as Labrador against Poe indicates, the scope of relief is a separate question for them. Oh, I understand it's a separate question, but there are plenty of times that the government comes to us and asks for both. Absolutely. For example, recently in the Wilkins and Cox application we did exactly that. And the reason why you didn't ask for both here is because you think that the merits question needs percolation. Yes, but also more fundamentally it illustrates that the very problem with these nationwide injunctions is they force this rushed, fast and furious decisions on the merits. So I think it would be very inappropriate in this case to come to a stay application saying, please give us a rushed decision on the merits of something that's very complicated. But the government's done that in other cases too, right? Those cases would be different. In this case, the example I gave earlier, we think it's very clear-cut on the merits. This one is, we can see it a novel and sensitive question. So this one is a clear-cut on the merits? This one, in this case, we want the court to address the remedial issue. If we offered the merit first, that's a vehicle problem because the court has, in many cases, just addressed the merits and not the remedial issue. And it's imperative from the federal government's perspective that the remedial question be addressed. Okay, so last question is about why that is. Justice Alito asked you, well, what's the point of this? If the same thing could happen, which is effectively the EO being enjoined everywhere via class action or because it's necessary to provide complete relief, say, to the states, is there any difference in your view between, say, a class is certified of all individual plaintiffs and they win, and the executive order class-wide, there's a judgment saying that it can't be enforced. Do you want to say, you know, follow-up, is there any practical distinction you see? Why does the government care? Is it just the rigors of the certification process or is it something more? The rigors of the certification process, keep in mind that in many of these cases, we successfully oppose class action. Let's assume, I think, you can't successfully oppose it here for individual plaintiffs. Well, I mean, that opportunity to have our day in court on that is very, very important. I understand, but let's assume, go with my assumption. Assuming that we were to lose in a- Assume the class is certified. Is there any benefit if a class is certified? And let's say, you know, you were pointing out that the executive order targets two different kinds of people. Let's assume that it's commonality because, you know, they only target one portion of the order, right? In that circumstance, does the government get anything different? This is back to Justice Alito's question about what's it to you? What's the practical difference to you? Do you want to say anything about whether there's a practical difference between a universal injunction and a loss in the class? Absolutely. Among many others, the represented class members are bound in the class action context. And that means that if they lose, they're bound by that as well. So they're taking a grave risk, so to speak, by proceeding through a class action. And it has this symmetry where the government is bound if we lose, they are bound if we don't lose. And that's a very, very important distinction. And you would respect that judgment? Yes, if it were a judgment. You know, now we may try to litigate in other contexts to try and get a different judgment from a different district court, but we would be bound by that judgment, as would they. And that's the crucial point. Justice Jackson? So as far as I can tell, your bottom line seems to be that what you call universal injunctions give relief to non-parties without going through the necessary steps, which you identify in Rule 23. Do I have that right? I mean, is that sort of like boiled to bare essence what you're saying? I would say there's a lot more to it, but that's one very important one. That's a key point that I want to focus in on for a moment. I guess I don't understand why you are saying that these kinds of injunctions are giving relief to non-parties. First of all, I think they can be also easily characterized as focusing only on the defendant, pursuant to the court's jurisdiction, personal jurisdiction, over this person relative to the subject matter jurisdiction that the court has, and the relief is telling the defendant, stop doing this thing that the court has found to be unlawful. So rather than characterizing it as a quote-unquote universal injunction, I think one could easily see that this is just about the extent to which the court can constrain a defendant over whom it has personal jurisdiction. Can it do so completely or just partially with respect to, you know, just say stop with respect to this plaintiff? I don't understand where this idea of universal injunction comes from in this context. I think the relevant distinction is an order that orders, in this case, the government defendant to cease allegedly unlawful activity as to the parties who have come into court and sued, and one that says to the government defendant, cease the allegedly lawful activity against everyone in the entire world. No, just cease it. Just stop. This thing, this executive order. I mean, we do this in the APA context all the time, right? The statute says you hold that the, you set aside the conduct, right, that it's unlawful, and we don't really parse it out and say, okay, but it's unlawful only as it applies to the plaintiff or not. So it's a very common concept for the court to enjoin a defendant from doing particular unlawful behavior, and what you're now asking us to do is to require that the court have an additional limitation in its order that says you only have to stop doing this with respect to the plaintiff, and that's the part that I don't understand. I guess, I guess, from what I can read from your papers and what you've said here, that limitation you say comes from this principle that if you don't do that, you would be somehow giving relief to non-parties, but I wonder if that's right. I mean, it seems to me that the relief is the judgment that you provide to the plaintiff that says stop doing this conduct, and you give it only to the plaintiff. That's where the limitation comes. The plaintiff is the only person who can go to court after you violate this order and enforce it. Other people are incidental beneficiaries of a court ordering you to follow the law. I mean, that's like everyone in the world. When the court says follow the law, anybody who would have been hurt by your not following the law benefits. Okay. I don't understand why that would limit the court in its ability to tell you don't do this unlawful conduct. Two responses to that. There's a lot there. Two responses to that. One is that principle that your question referred to is the holding of the court in wars against Selden, and it's reaffirmed in Gill v. Whitford, Lewis v. Casey, and similar cases, that the authority of the federal court, whether it's viewed as arising under Article III or under its traditional scope of equitable authority, is to remediate the injuries to the complaining party. And then to address your question about... Can I just stop you there? I'm, as the court, remediating the injury by telling the defendant to stop doing this behavior. The plaintiff has brought a claim that this executive order is unlawful. I look at it. I litigate it. And I say you're right. Stop doing it. You cannot enforce this order. So I don't understand why that's, like, outside the scope of Warth v. Selden. If the court in that case is imposing what we've called an indivisible remedy, for example, vacator under the APA, there's a debate about what set-aside means. Assuming it means to vacate, then the remedy that Congress has provided as a condition of its delegation to the agency is if one part of the regulation is unlawful, then the remedy granted, which directly remediates the plaintiff's injury on that hypothetical, is an indivisible remedy that benefits others. Here in this case, and in all the other 40 cases, we see something totally different. It is not necessary to remediate the injuries of the plaintiff before them. I understand. Let me just turn your attention to one other thing, because the real concern, I think, is that your argument seems to turn our justice system, in my view at least, into a catch-me-if-you-can kind of regime from the standpoint of the executive, where everybody has to have a lawyer and file a lawsuit in order for the government to stop violating people's rights. Justice Kagan says let's assume, for the purpose of this, that you're wrong about the merits that the government is not allowed to do this under the Constitution, and yet it seems to me that your argument says we get to keep on doing it until everyone who is potentially harmed by it figures out how to file a lawsuit, hire a lawyer, etc. I don't understand how that is remotely consistent with the rule of law. I appreciate that you go back to English common law and the Chancery Court, but they had a different system. The fact that courts back in English Chancery couldn't enjoin the king, I think, is not analogous or indicative of what courts can do in our system, where the king, quote-unquote, the executive, is supposed to be bound by the law, and the court has the power to say what the law is. One would think that the court could say this conduct is unlawful and you have to stop doing it. I think the catch-me-if-you-can problem operates in the opposite direction, where we have the government racing from jurisdiction to jurisdiction, having to clear the table in order to implement a new policy. A great example of this is in the Schilling litigation, where the military had a military readiness policy. It was universally enjoined by the DDC. It went up to the D.C. Circuit. The D.C. Circuit stayed that injunction to allow that policy to go into effect, and then one hour later, a district court on the other side of the country universally... Can I just ask you one final thing? Because this relates to also something that Justice Kagan said. I would think we'd want the system to move as quickly as possible to reach the merits of the issue and maybe have this court decide whether or not the government is entitled to do this under the law. Wouldn't having universal injunctions actually facilitate that? It seems to me that when the government is completely enjoined from doing the thing it wants to do, it moves quickly to appeal that, to get it to the Supreme Court, and that's actually what we would want. What I worry about, similar to what Justice Kagan points out, is that if the government is saying no lower court can completely enjoin it, it actually means that the government just keeps on doing the purportedly unlawful thing and it delays the ability for this court to reach the underlying issue. Percolation of novel, sensitive, constitutional issues is a merit of our system. It is not a bad feature of the system. Thank you. Thank you, Counsel. Mr. Feigenbaum. Mr. Chief Justice, and may it please the Court. This Court should deny the emergency application because this injunction was properly designed to ensure that the states would get relief for our own Article III injuries, as we suffer significant pocketbook and sovereign harms from implementation of this executive order, including from the application of this EO to the 6,000 babies born to New Jersey parents out of state every year. The U.S. prefers alternative approaches for granting that relief, alternatives it never raised in the district court below, but its approach would require citizenship to vary based on the state in which you're born or even turn on or off when someone crosses state lines, raising serious and unanswered administrability questions, not just for the federal government but also for the states, and it would offend the text and history of the Citizenship Clause itself. Since the 14th Amendment, our country has never allowed American citizenship to vary based on the state in which someone resides because the post-Civil War nation wrote into our Constitution that citizens of the United States and of the states would be one and the same, without variation across state lines. The U.S.'s claim that Article III establishes a bright-line rule barring such injunctions, no matter the circumstance, even where the states do need it to meet their own harms, finds no support in this Court's cases or in the history of equity. Its argument that a single district court cannot decide birthright citizenship or that we need more percolation on that question for the nation overlooks that this Court already settled this exact constitutional question 127 years ago and that this EO is contrary to over a century of executive practice. Finally, the U.S.'s objection that nationwide PIs have simply become too common in the last few months, a complaint about other injunctions sought by other parties, cannot undermine the extraordinary basis for this one. The states, who regularly come before this Court as plaintiffs and defendants alike, agree that nationwide relief can be reserved for narrow circumstances, but it was needed here. I welcome this Court's questions. Putting the merits aside, what do you think is the origin of, or at least the pedigree, of universal injunctions, particularly the Bill of Peace, if you would discuss that? Absolutely, Your Honor. So there's two categories of these broad injunctions. So first, although we use the term nationwide injunction, if the nationwide injunction is actually about meeting our harm and the alternatives are not legally or practically workable, then it isn't even a universal injunction, as I know this Court's separate writings has used the term, because it's about meeting our own Article III injury, which is our basic submission about this case. But we do agree that there's some space for universal relief. We trace it back through the history from the Bill of Peace through Equity Rule 48, which specifically clarified that in the American equitable tradition, it was not always the case that universal relief would bind the nonparties, even as it might benefit the nonparties, continuing on to the tax collection injunctions in the 19th century and then continuing on as recently as this Court's order in AARP. So I do think they've always been in narrow circumstances. They've never been the reflexive or norm of how relief should be granted in this country, but they have been available. I don't think I need that for my case, but I do think they're available in narrow circumstances. You say they should be available only in narrow circumstances. Why is that? Yeah, so I could offer the three that I think make the most sense, but we're mindful of some of the concerns that the United States raises. We are states who've benefited from federal policies. We are states who have our own statutes and policies. So sometimes we are on the other side of the V in cases involving universal relief. So we are sympathetic to some of the concerns the United States has about percolation, about running the table in particular cases. We just don't think that that supports a bright-line rule that says they're never available. And we've identified, I think, at least three circumstances where they would make sense to be available. The first would be in cases where the alternative ways of remedying the harm for the parties are not practically or legally workable. That's this case. And I'll return to that in a second. The second would be congressional authorization. So I took my friend on the other side to try to set aside vehicular, but I do think that Article III objections would raise serious questions for remedies like vehicular, for remedies like the Hobbs Act. Even the Hobbs Act, which could set a nationwide PI after a multi-circuit lottery, might ultimately have problems under their view of Article III. And then the third thing I would say is there may be cases in which the alternative forms of getting non-party relief are not legally or practically available. So that might be a case like AARP or even a case like this one, where district courts could consider the availability of the class action device, but if it couldn't move fast enough, because Rule 23 doesn't include TROs and PIs, if it couldn't move fast enough in those contexts, courts might need to step in anyway. But I think we fit in the first bucket in this particular case because the alternative ways of remedying our particular significant pocketbook harms to the tunes of millions of dollars can't be remedied, as the district court found below, without granting us this kind of relief. Well, I mean, you could benefit through percolation and a decision from this court with reasonable expedition. So I have no objections to reasonable expedition. We would have no objection to this court even setting supplemental briefing on the merits and hearing the merits directly. I'm happy to talk about the ways in which I think the merits do bear on this emergency application. But more fundamentally to your question, Mr. Chief Justice, I would just note that I don't think the alternatives actually fully remedy our injuries in a couple of different respects. So I heard my friend on the other side just specifically say today that maybe there can be an instruction to the federal government that at least when you're dealing with the plaintiff states, you treat these individuals kind of as though they're citizens, even if they're not really citizens. And that doesn't work not just for the federal government. I agree, Justice Gorsuch. It may well be that the federal government can decide when to take its own medicine. But I'm talking about administrability burdens on the states, and I'm talking about administrability burdens on third parties as well. Final question about that, counsel. Your three buckets are very thoughtful. The first one seems to me kind of consistent with traditional equity, which is if you've got to remedy the plaintiff's harm. That's your point there, and you're saying we fall in that bucket. I get that argument. The second bucket is possibly Article III that Congress could authorize and maybe has authorized circumstances. But that doesn't answer the equity point. So we come to bucket three. And I'm struggling to understand what the rule is there. You seem to suggest, well, if it's really important and if you have to act expeditiously, then go ahead. But I think every district court who enters one of these thinks that's what they're doing. So what's the constraint there? If you share the government's concerns about the rise of these things in the last few decades, what piece does any of that have? So I do feel like something is an amicus to this question because nothing in my injunction rises or falls on this third bucket. So I'm happy to answer questions. I need all the amicus I can get. Fair enough, Your Honor. So I would say two things about that. The first is it does require reading the history in a way more like I do, which does not create a single bright-line rule that this is never available. Obviously, if someone reads the history, I'm saying it's impossible. I'm spotting you that for the purposes of my question. Great. I'm not granting it. I thought you might not, Justice Goldman. But I'm spotting it to you. And I'm just saying, well, okay, what would that look like and how would that be any different from what we have experienced over the last few decades? So this is a way in which my first bucket and my third bucket are actually going to relate for a moment. No, no, no, no, no, no, no, no, no, no. Just squiggle out into the first bucket, okay? We're in the third bucket. I'll answer for the third bucket, which is, I think it requires having district courts consider the availability of the alternative and explaining why it's not workable in the case. I think we've told them to do that. And, you know, gosh, how many times do we have to tell them to do that? And I think, in fairness to them, that's what you think they have. So let's, again, would any case in the last 30 years come out differently under your view of the rule in the third bucket than has? Yeah, so there's a couple of examples where we don't think universal relief was appropriate. I'm most familiar with the state litigation, so most of my examples will probably come from there. But I heard my friend on the other side mention the DACA litigation, where Texas sought the termination of DACA, and ultimately the Fifth Circuit terminated DACA specific to Texas alone. And we thought that that decision was exactly right because of the nature of the harms in that case meant that Texas could get full relief for its harms. Now we're back to the first bucket. We're just satisfying the... I take the point. I'm so sorry. See what I'm saying? I take the point, yes. I get that we're going to always revert back to the first bucket, but that means the third bucket's empty. I totally take the point. I think AARP is a good illustration of the third bucket that this court confronted recently, where it was the case that there was this rush, just a few hours, not possible to go through class certification. You heard my friend on the other side talk about the rigors of class certification, and I don't think my friend on the other side would agree. It could be done in three hours through the night. And so there was a necessity to step in. Do you agree about the rigors of class certification? It seems to me that 23b2 classes, and you probably, if you have to, are going to be arguing that they're not so rigorous to meet for injunctive relief for national policies that are uniform. So the most important thing that hasn't come up in the discussion this morning yet is that they're not available for state litigation. It talks about persons, it talks about appointment of class counsel, it talks about going through the certification process. States, and this court's precedents are really clear about Pyron's fat trial lawsuit, states can't represent those individuals in class actions, nor would we try to. They can't represent us, and you don't have classes of states. So the whole framework doesn't apply to state litigation. So I understood how it might come up as an alternative for some other cases you might see in the future, but for the injunction you have in front of you from the states, the whole class device doesn't even work as an alternative. So I don't see how it can be the answer for us. But why should you care if the class device doesn't work as an alternative if you have bucket one? Like, you don't really need the class device. I think what you're saying is, well, it'd be frustrating for states not to have the class device when the individuals have it, but I don't see why that's true if giving you complete relief in bucket one solves your problem. So I should be very clear, and I'm sorry for the confusion on this. This is Dr. McAuliffe, this is Justice Gorsuch. When states are seeking the relief, states are seeking it in bucket one and bucket two. As an amicus to the other injunction I recognize courts are looking at, I think bucket three could be available. We aren't seeking relief when it falls into bucket three because as I was saying earlier, we're not going to be seeking relief for other parties. This court's cases, like Brackeen, make very clear we aren't suing to vindicate the injuries that third parties and our residents are suffering. So when states come before you, the questions that you would ask are, are the alternative ways of remedying our injury going to be practically or legally workable? And you're going to ask, did Congress authorize it, which gets to the vacater question, which gets to the Hobbs Act question, and so on. And on that first bucket, which I think describes this case well, I had a hard time with some of the colloquies earlier today because I think they were missing some really serious burden that the states are still going to have to bear in this case if we get something less than a nationwide injunction. I think it's going to hinder the administration of our benefits programs. I think it's going to hinder the participation in our benefits programs. And I think it's going to produce unprecedented chaos on the ground. And I might offer examples of each. Before you do, I'm sorry. Not at all. How would you get the merits of this case to us promptly? So there's two different ways that this court could think about doing it. So the first is, I heard a couple of colloquies earlier today to suggest that maybe the states should sort of have to take some of the burdens on ourselves because, okay, some people move in. Maybe that's just something that equity shouldn't care about. And it may be true, this is Hornbook equity, that in some cases, states don't get complete relief for the harms that they suffered. We just have to eat some of the administrability burdens. But the merits have always come into that because that is just about remedying a party's own injuries. And the strength of the ability to remedy our injuries is going to turn on a peak on the merits. This is partially Ohio versus EPA and building on Justice Kavanaugh's Labrador concurrence, where this court said you might have some states who really like the policy and some states who want to get relief from the policy. And how you reconcile those two things, who should get relief, who should benefit from the policy, will turn in part on a peak at the merits because we have a greater right to relief from it. I appreciate that. How do we get to the merits fast? This court could set supplemental briefing on the merits by an order tomorrow if it wished, specifically to say the federal government has proposed that states get less than complete relief in this case. We could not possibly think about giving the states less than complete relief without looking at the merits. We want briefing. Put that aside. Assume we've just got the remedial question before us and we're going to decide the remedial question one way or the other. Then what? Oh, then I share some of Justice Kagan's concerns from earlier that it would rely on him. I appreciate you share those concerns. How would you address them? How would the states plan to get this case to the court promptly? I think it's very hard to think about how the states would lose this case given the state of Supreme Court precedent. It creates very weird incentives on the certiorari docket when there's already binding precedent from this court. We do suffer harms from the application of this executive order beyond our borders that we need relief from. If we don't get a full remedy from that, I suppose we could ultimately seek cert before judgment on the basis that we still have Article III injuries that we're suffering, but we'd be asking this court to grant review from a circuit precedent we won on the basis that we have. Continued injuries, it's not impossible. This court knows best when it grants cert and when it doesn't. I would think it's not the cleanest way to TF a case historically, and so it would raise some real concerns to the colloquies earlier today about how this case would ultimately come before this court. Are you telling us that we really can't decide the question that we ask to have briefing and argument on without taking a peek at the merits? So I'm not saying that at all. So there's two different ways to think about this case, Your Honor. One is to say, absolutely, the states need to get complete relief for their injuries, and then let's figure out the best way to do it, and we think the alternatives are not workable and not legal. If this court is going to entertain giving us anything less than full redress for all of the Article III injuries we bring before you, I don't see how that can be entertained without a peek at the merits, because you always look at the merits to decide, should we get 100% or 90% of our own injuries redressed? Would a decision on the matter that I understood to be before us, an arrow question that I understood to be before us, be helpful in any way if we do not peek at the merits and we also do not decide whether you have standing? So I'm not sure how you could decide whether or not we got an appropriate scope of relief without figuring out what our own injuries are, because how you decide, this is the United States' own argument, how you decide whether or not we should get relief for our own injuries turns on what our injuries are that require relief. And so I do think we have pretty significant pocketbook injuries like in Nebraska to the tunes of millions of dollars, and whether we get those remedies or don't get those remedied is going to turn on the merits, is going to turn on the nature of the harms, and then ultimately the workability of the alternatives. Thank you, Counsel. Justice Thomas, Justice Alito? Well, General Sauer began by outlining problems that he sees being created by universal injunctions, and he said that the issue was a non-ideological issue and a non-partisan issue. Do you agree with that? I do think presidents of both parties have objected to nationwide injunctions. I agree. So what do you say about the practical problem? So let's put out of our minds the merits of this and just look at the abstract question of universal injunctions. What is your response to what some people think is the practical problem? And the practical problem is that there are 680 district court judges, and they are dedicated and they are scholarly, and I'm not impugning their motives in any way, but you know sometimes they're wrong. And all Article III judges are vulnerable to an occupational disease, which is the disease of thinking that I am right and I can do whatever I want. Now, on a multi-member appellate court, that is restrained by one's colleagues, but the trial judge sitting in the trial judge's courtroom is the monarch of that realm, and there are situations in which the president does something. It could be President Trump. It could be President Biden. It could be President Obama. The trial judge says this is unlawful and I'm going to order, I'm going to enjoin it, and I'm convinced I'm right, so I'm not going to stay the injunction. And then an application is made to the court of appeals to stay the injunction. The court of appeals gives it the back of the hand, and then the case comes immediately to us in the context of an emergency application. And some of us have said, well, we don't think we should do anything in those situations unless it is indisputably clear that the court below was wrong. So what do you say to that practical problem? So we're mindful of the practical problems. I will say the states have had a through line as well across administrations. We have never believed, even as nationwide injunctions restrained policies that we favored, that they were categorically off the table. We've always taken the position that they are sometimes available in narrow circumstances, whether we like the policy or don't like the policy. And so you might have some cases where the nature of the harm, this is the DACA example from my friend on the other side, where the nature of the harm, which was Texas saying it had to give benefits to residents in the state, is actually entirely remedied by a nationwide state-only injunction that applies just to Texas, because that might incentivize individuals to leave Texas, and then Texas doesn't have to give them benefits anymore. So you might have a case like that. But sometimes you are going to have cases where it is impossible to remedy the state's own injuries, and the alternatives are not practically or legally workable, and that describes this case perfectly. And so I don't think the answer is a bright line that means, even in those situations, it's not possible for the state to get relief. In deciding the question that is before us here, do you think we should – never mind, I withdraw that. I have no further questions. Justice Sotomayor? Let's start with an answer you've been trying to give and haven't completed, which are the general suggested there were two ways that your injuries could be remedied. He claimed they were both presented to the court below. I didn't see that, but that's a matter that we could check on. Do you agree with me that they were not presented to the courts below? I do agree with you. So I want to be very clear, because I think there's some confusion across the briefing here. We agree, and I don't think the First Circuit disagreed. They objected to the nationwide injunction in the district court, and we attached the briefing and we attached the transcript. What they didn't do is provide some of the alternatives they've pressed in two sentences in their motion of application.  So now go through why you question whether there are two suggestions now that they've only raised before us are inadequate to remedy all of your harms. Because complete relief, he says that there is situations in which you grant relief that will benefit third parties. Why is your relief necessary to give you complete relief, even though it benefits these parents in other jurisdictions? So I don't think there's any serious dispute that if you limit the relief to babies born in New Jersey, we won't get complete relief, because 42 U.S.C. 1396A, the Medicaid statute, requires us, the states, to do the citizenship verification. So it's not true that they can simply handle it all for themselves. Federal law requires us to undertake those responsibilities. And we have, in New Jersey, 6,000 babies born out of state every year. When they come into the state and they need benefits, the Boyle Declaration for Massachusetts suggests that's going to cover 40% of kids. They come into our state, they need benefits. We have to do citizenship verifications, which is a burden for us. That's for you in New Jersey, but there's, I think, how many states? That's just an example. We have 23 attorney generals in this. 23 attorney generals. So 23 states are going to have babies who were born somewhere else without a birth certificate that you're now, if they move into your state, going to have to do checking on. And that comes to the United States as alternative, Justice Sotomayor, which is they say, okay, maybe their citizenship turns on when they enter New Jersey, maybe for some purposes, maybe for all purposes, depending on which sentence you're looking at in the emergency application. And there are three problems either way. The first is it will undermine the administration of our benefits program. So individuals will move in. When they were born, they were treated as noncitizens. They didn't get Social Security numbers because they wouldn't have been eligible for the enumeration at birth program in their state. And they're going to arrive and they're going to seek benefits that we administer. But federal law requires that they have Social Security numbers for the administration of those benefits. This is 7 U.S.C. 2025 for SNAP. This is 42 U.S.C. 1320B7 for TANF, for Medicaid, and so on. So they're going to need to have Social Security numbers. They're going to arrive without them, even though they were under this Court's precedence, citizens who should have been in the enumeration at birth program who should have had Social Security numbers. And it's going to be a burden on us, either in delaying the benefits, training county social service workers in having to administer benefits without the SSN on a provisional basis. So that's the administration of the benefits. Let me give an example on participation, which we have responsibility for as well. These are babies who were told that they, their families were told, that the babies are undocumented, they aren't citizens, they're not eligible for these federal programs when they were born. They come into our states, they think they're now ineligible. They don't realize their child is a citizen entitled to these federal benefits. And so what will happen is, we bear the responsibility, putting in our own state Medicaid plans, of getting them enrolled. And that's 42 U.S.C. 1367BB. So we're responsible for putting in our plan how we're going to enroll them. We have to incur substantially more costs to get them enrolled in our programs because they think they're undocumented, they think they're ineligible because of where they were born, even though their citizenship has now turned on when they cross state lines. And then the last point is, we've never in this country's history since the Civil War, had your citizenship turn on when you cross state lines. So we don't have answers to these workability questions, not just because it wasn't presented in the district court, not just because it's two sentences in an emergency application, but because for over a century, executive practice has been uniformly to the contrary, building on this court's decision in Wong Kim Ark. So we genuinely don't know how this could possibly work on the ground. And although my friend on the other side has complained that they weren't able to give guidance, the states didn't object to guidance. The states have no quarrel with internal steps, and if they want to put out guidance that says, if Wong Kim Ark gets overruled, this is what we would do, that's fine. What they can't do is require us to take any steps or issue guidance that requires everyone to start planning for something that is so patently against this court's own settled precedent. Now, going back to the history question that Justice Thomas started with, you relied on the Bill of Peace, you relied on the tax injunction of the 19th century, and not so far in the 19th century, 1891, just about the time the 14th Amendment was adopted. At any rate, there are other cases, one of our amici points out to them, the Pierce versus Society of Sisters case, the West Virginia State Board of Education case, those were earlier than the 1960s. In the Pierce versus Society of Sisters, the court affirmed a universal injunction that wasn't even sought by the parents, correct? That's right. And there, what we said was, their states were imposing criminal penalties on parents who sent their children to private school. And just two plaintiff schools sued against that penalty. They sought and won an injunction that categorically restrained the state from enforcing the law. That was 1925, correct? That's right. And similarly with West Virginia, saluting the flag by Jehovah's Witnesses. The injunction was universal. So in answer to Justice Gorsuch's point, we've had universal injunctions in some form, correct? Since the founding. That's right. If I can make two points on that. Correct.  So I agree with your reading of the equitable history, that it goes back from the English Pill of Peace through Equity Rule 48, through the tax collection injunctions, through Equity Rule X, through the Ex Parte Young Period you're referring to, through AARP just a few weeks ago. So I agree with your read of the history. But I just want to make one quick point. Well, let me, go ahead, make your point, but I want to finish this thought, which is you started earlier by saying universal injunction should not be the preferred remedy. And it should be limited. You've suggested three ways to limit it. I agree with you. Those three, and yours clearly falls within one. That's your claim. But the point that I think my two other colleagues are raising is, how do we ensure district courts are following that? So if I can make a point about the history, I can make a point about the guidance. On the history, I understand that the United States at the podium today tries to make the history all about what it calls indivisibility cases, cases where there's just a unitary on-off switch, as it were, and either something happened or it didn't happen, like a redistricting plan needs to be completely redone or a power plant is on or it's off. But if I could give an example that shows it's not quite so limited and it very much requires looking more broadly at what's practically or legally workable on the ground, I would point to apportionment as an example. So say that there's an executive order that says we're just not going to count minors, people under 18, in apportionment anymore. We're only going to count people who are voting age. And the state of New York files a lawsuit and it wins its lawsuit and all of its 17- and under-year-olds get counted for apportionment. That isn't indivisible in any way. It's not a redistricting plan, it's not a power plant, but it is going to skew apportionment in a way that is totally unfair, practically and legally, to third parties, because now 17-year-olds are being counted in New York but they're not being counted in Oklahoma. And you would end up messing up apportionment between states for that very reason. And that shows, as just a broader insight, that we've always looked to the harms that third parties will suffer as negative externalities of court orders, and that's our submission here, that to accept what the United States wants as against our injunction and to say that it turns on or off when you cross state lines doesn't just harm the administration of our benefits, doesn't just even harm enrollment in our benefits, also puts chaos on the ground where people's citizenship turns on and off when you cross state lines. If ICE has initiated a removal proceeding when you live in Philly and you move to Camden, I suppose the ICE removal is supposed to turn off at that point, potentially, because your citizenship status has changed. I don't know if you lose it if you move back to Philly, whether you were born in New Jersey or born in Philly, move to Camden and move back. It's a very porous part of the country. I don't know if the ICE removal turns back on when you cross state lines again. And that sort of chaos on the ground, those implementation questions we don't know, are serious third-party harms we've always taken into account. This is North Carolina versus Covington where courts ask what's workable as an injunction matter, and it's also the Winter Factors where Factor 3 looks at the balance of the equities between the parties and workability and harm to them, and Winter Factor 4 looks at public interest and the negative externalities and workability problems we're imposing on others. Justice Kagan? General, you've had a chance to talk about your administrative costs and the workability problems that New Jersey would confront, but how about this magnet problem? I mean, it strikes me as completely obvious that if you have two states and they have different rules for citizenship and one benefits babies and the other doesn't, that everybody moves to the state where the more favorable rule exists. But why is it that preventing that harm from happening should count as providing you with complete relief? So I think actually my point is somewhat different. I agree with you that the incentives could potentially factor into the calculus because we're ultimately experiencing some harm we might not otherwise to our benefits programs, but my point is different. Even if you just take normal migration for New Jersey, 6,000 babies born out of state, 8 million every year traveling across state lines, without worrying about the incentives, we're going to be looking at that problem for how we administer benefits programs. I got that. Are you saying we shouldn't consider? No, I think you can. I think you can, Your Honor. And it's because of the nature of three things together. One is it's the movement, but it's not just the movement. Two is it's the fact that citizenship historically was something you had at birth or didn't have at birth, and so you arrived to our state, in theory, without birthright citizenship because you would have been told when you were born in the hospital what you have or don't. And then the third, and this is really important, is the way that citizenship permeates so much, not just for individuals, but for what states are obligated to do, whether it's citizenship verification eligibility, whether it's enrollment in our own programs. Over and over, you see citizenship in Congress's own laws as the on or off switch for our own administration of benefits, and that's actually sort of unique. So I don't think every time people move between states, you automatically need to have a nationwide injunction. What you need is a demonstration about how that's going to contribute to the state's harm, and then, I think this is really important to colloquies you were having with the United States earlier, a court could, in an appropriate case, say, well, sure, state, you might have to keep some of the harm. We're only going to remedy 90% of your harm because it's too disruptive to everyone else, but I don't think you can do that in a case without looking at the merits, because whether we should get to 100% of our injuries taken care of or 90% of our injuries taken care of will always involve the strength of our merits showing, and I don't see how you could have a stronger merit showing than we have here. 127 years of Supreme Court precedent, over a century of executive practice, and congressional statutes that codified both into law in 1940 and 1952, and given that strength of the merits and the settled precedent, combined with our nature of harm, I don't think this is a close case for why we need national relief to remedy our injuries. Thank you. Justice Gorsuch? Justice Cameron? Justice Barrett? I have a question about the history. So, Grupo tells us that we have to look back to 1789 and the High Court of Chancery, so I appreciate that there have been some cases from later, and you were talking about some of those with Justice Sotomayor, from the early 20th century, maybe the late 19th century. Can you say, and let's say that I think the Bill of Peace is more like a representational suit that is a forerunner to the class action. What do you think is your very best example of something that would look at the period that Grupo tells us is relevant that would support something that looks like universal relief? So, I do think from 1789, from English equity, I do think the best example is the Bill of Peace, and so I understand if we see it differently. It's a fair point. I will just say quickly on Grupo Mexicano, its own tradition, and this is sort of the analogical reasoning you talked about in Rahimi, it looks at that period, but in other times, we've also looked at American tradition to see analogically how we've liquidated that tradition or not. And in American equitable tradition, this is Equity Rule 48, which specifically said, non-parties are not bound by certain relief, even as they may benefit from it. And I take that to be the principal reason my friend on the other side thinks that Bills of Peace look much more like class actions than they ultimately look like universal injunctions. And Equity Rule 48 was to the contrary. Tax collection injunctions in American history were to the contrary. So, I just have a hard time with that reading, even though I agree with you that you would be starting in the founding trying to do analogical reasoning based on what Grupo Mexicano says, but using American equity to answer some of the unresolved ambiguities. Oh, I completely agree with you. You need some analogical reasoning, and I don't think that Grupo completely rules that out. And I mean, I think even if you talked about the distinction between a Bill of Peace and a class action, you would be looking at some of it that doesn't have to be called the same thing. I think the problem is when we have such a party-centric history, if it has to be reasoning that fits within the confines, then I think we have a little bit of trouble. Let me just ask you one question about relief. So, let's say that I think that the states do need something broader in order to have complete relief, even if the universal injunction is too broad and inconsistent with Grupo. That isn't how the court below approached the question because that isn't what the court below thought it had to do because the court below thought it could just enter a universal injunction. So, how would I go about crafting some sort of holding or to create a language that would take care of you and the fact that you need maybe broader complete relief than maybe an individual plaintiff would, right? Because the district court didn't go through that analysis, the analysis that you're telling us today. So, tell me practically what that would look like. So, I think the district court in the Massachusetts case did actually do a very good job of this. It specifically said, I'm saying New Jersey is a stand-in, 23 attorneys general. The states need this relief and he didn't grant universal relief to the individual plaintiffs in that case. So, he did actually get some relief for different parties and he said, this is necessary for us. Part of why we're talking about alternatives in a different way at the podium today is because these alternatives were not presented to the district court. So, the district court just had before him the idea that maybe we have to eat some harms or maybe we get universal relief. And of course, we need universal relief given the strength of the merit showing as between those choices. I think what you could say is here, there were two sentences in an emergency application that raised new alternative ways to remedy the harms. Those sorts of things need to be raised to the district court and when they are raised to district courts in appropriate cases, when states file suit, courts should ask first, are those alternatives going to be practically or legally workable for the plaintiffs and for third parties? I agree to Justice Gorsuch's point. If the federal government wants to take on its own burdens, it can do so, but it can't just say that for third parties. But you're talking about what would happen in the future. I'm talking about what would happen to you now. Oh, so I think if the United States seriously wanted to press these alternative with facts about how they would work and put that before the district court, parties can always put new alternatives in a motion to dissolve an injunction before the district court. That's something that has happened regularly when there's changed circumstances or new alternatives. They're welcome to do that in this case or in any other, but then they're going to have to put forward actual facts about how it's practically or legally workable. I will say on its face, these two sentences don't look practically or legally workable for the reasons I raised, but they'd have to make that showing in the district court in the first instance. Thank you. Justice Jackson? I guess I'm kind of hung up on the posture in which we find ourselves looking at these issues. Justice Alito, I think, focused on this a little bit when he says that the district court makes this initial determination. It turns out to be wrong. The remedy, I thought, was to appeal. And I guess, for me, the question is whether and under what circumstances the government keeps on doing the thing that the court has found unlawful while the litigation is proceeding to determine whether or not the government's activity violates the law. We're sort of in an interim posture. Many of your arguments, and I appreciate them, are kind of couched in, you know, the state is going to need complete relief for their injury, and that's true definitely as a final matter. But here we are at the beginning of this litigation. No one has determined whether or not the government's conduct is actually unlawful. We have a district court, several district courts, and now courts of appeals that say it is. And so, as an interim matter, we are saying the government has to stop doing it while we litigate the issue of the unlawfulness. To me, that kind of puts the whole thing in a different frame. It's sort of like, why isn't the question in this posture, in this circumstance, can the government or has the government shown that it is going to suffer some sort of harm from being made to completely stop this activity while we're litigating the lawfulness of the conduct? I don't understand. And then you say, yes, we're going to suffer harm. This is the balance of the equities that, you know, part of the PI and the state showing, but I just don't understand why that's not the focus here. And I apologize because I didn't get a chance to ask Mr. Sauer this, but maybe he can address this on his rebuttal. But, you know, what problem is the government facing as a harm matter from being completely told it has to stop doing this while we determine, we, the court system, determine whether or not its conduct is lawful? So we, I mean, we included this in our application. We do think this case is quite unique and that I do think it's hard for the government to show in this particular case that it needs to be able to act contrary to this court's settled precedent. That's obviously come up in a couple of questions today. It's something, if I realize the elephant in the room, I've often been asked to assume that the merits are put to the side and I'm fine assuming that for those questions. But to your point, you're not wrong. It is quite striking, obviously, that it's not just that district courts are saying this looks like it might be unlawful. They're saying Wong Kim Ark settled this exact issue 127 years ago. This court has reaffirmed it since. Over a century of executive practice is built on that and Congress has codified that directly into law. So I do think it's a particularly unusual case for the government to be saying that it has been quite so harmed and needs this kind of relief. But at the end of the day, I'm happy to draw an issue on when relief may or may not be appropriate and I just think we're clearly on the positive side. But you're saying that, at least in some circumstances, from your perspective, in order to even decide whether or not you are entitled to an interim complete injunction, the court's now going to have to peek at the merits while the merits are being litigated. I think the court always has to peek at the merits in deciding whether the party itself should be getting relief from its harms, including complete relief, as even the United States accepts. So those are all four of the winter factors. You have to figure out what the irreparable harm is that you're trying to deal with. You have to figure out if we have a sufficient merit showing in order to eliminate that irreparable harm. And depending on the strength of the merit showing, you're also looking at winters factors 3 and 4. So this court has given four winter factors that I think are quite useful in most cases. I took my friends on the other side to be saying, well, beyond the winter factors, there's this bright-line rule from Article 3 or the history of equity that just says it can never get to this point. I obviously disagree a bit with them on the reading of that history, but I just think it has no bearing on the case that the states bring to this court here. Thank you. Thank you, counsel. Ms. Corcoran. Mr. Chief Justice, and may it please the court, the executive order's stripping of citizenship from U.S.-born children is contrary not only to the 14th Amendment's main text, but also our common law history, this court's precedent, a federal statute, and over a century of executive branch practice. Every court to have considered the issue agrees that the order is blatantly unlawful, a determination the state application does not challenge. The government instead argues that Article 3 and equitable tradition categorically prohibit providing non-party relief from the order's enforcement, regardless of the order's illegality or the irreparable harm it inflicts. The government is wrong. It is well settled that preliminary injunctions may benefit non-parties when necessary to provide complete relief to the plaintiffs or when warranted by extraordinary circumstances, both of which are true here. The court should reject the government's efforts to say a preliminary injunction that maintains a status quo all three branches of government have ratified and operated under for over a century and that prevent the catastrophic consequences that will result for the plaintiffs and our country if the government is allowed to execute an unconstitutional citizenship stripping scheme simply because legal challenges take time. I welcome the court's questions. You say the government is wrong about the availability of preliminary injunctions. On what do you base that? So I think the two reasons I identified, one, it is well settled, and I understood General Sauer to agree today, that universal injunctive relief is appropriate when necessary to provide complete relief to the plaintiffs. That is the case here, and I'm happy to talk about that. But I also, you know, this court has long recognized the availability of universal injunctive relief in extraordinary circumstances where it's justified, I think, by the focus particularly on the public interest and equities prongs of the winter test, and I'm happy to talk about that as well. But I think those are the two reasons the government... Do you think that even if one considers the history not to support you, that the pragmatic considerations and the policy considerations should override that? So I, you know, again, I would put us in the complete relief bucket. Like Mr. Fagenbaum, I'll put on my amici hat in answering that question. I understand General Sauer's proposal to be that we channel all of this through Rule 23. I think that is a historical one. It's inconsistent with the Rules Committee's understanding of the rules. If you look at Rule 23, Rule 65, and Rule 71 together, they establish that Rule 23 is not the channeling mechanism that the government's suggesting. I'll start with Rule 71 because it's responsive, Justice DeBarrett, to your question earlier about whether non-parties can enforce orders. Rule 71 explicitly contemplates that and says if a non-party receives relief, they are entitled to enforce it. I'd point also to Rule 65, the preliminary injunction rule. In 2017, the Rules Committee considered a proposal from Professor Bray to amend the rule to prohibit relief to non-parties. The committee rejected that proposal because it found that it ran afoul of the Rules Enabling Committee. And then I'd end by pointing to Rule 23 itself, which says nothing about it being a channeling mechanism. In Principe v. Scarborough, this court said, you know, we don't treat the rules as excluding background equitable practices. And here, Rule 23 doesn't even contemplate preliminary relief. It's focused on permanent injunctive relief, and I think that's because, you know, as we've been discussing, it's very difficult to get class certification in time to have preliminary relief, so you're doing putative class relief, which is the exact same thing as what's happening here. Well, why can't you get putative class relief in a preliminary injunction or TRO posture? You mean, sorry, in the... Get relief for a putative class in a TRO or PI posture. I certainly think you can. The court did that recently in AARP. My point is when the court does that, it's relying on the equitable authority it has to enter that sort of relief, not on the Rule 23 mechanism, because the class isn't binding until after certification, until after final judgment. If that mechanism is available, whether one way or another, doesn't that solve a large part of the problem in a way that complies with the rules, the problems with universal injunctions that have been identified by administrations of both parties? Go through Rule 23 and do what's needed there, and people are bound then, so that's a wrinkle. But why doesn't that just solve the problem? Right, so they're not going to be bound until after you get past class certification. I understand that. And for that reason, I would go to Justice Alito's point earlier, that all you're doing is taking the non-party injunctions that are happening now outside of Rule 23 and shoving them into Rule 23. It doesn't address the forum selection concerns. It doesn't address the concerns about the emergency dossier. It complies with the rules. I mean, the law, we care about technicalities, and this may all be a technicality, but it seems to me the technicality of Rule 23 and the history of that provides... 23b-2 provides a mechanism to do what's needed here in terms of getting relief to people. And if you have PIs available for putative classes, that seems to solve the issue for preliminary relief and the timing issue as well. So b-2 provides for permanent injunctive relief. It does not provide for preliminary injunctive relief. Again, Rule 23 does not purport to be the exclusive channeling mechanism. And as I said, the Rules Committee doesn't think it did, so it would be this court kind of projecting its own policy decision to treat Rule 23 that way. And I would come back again to Justice Alito's concerns. That is not actually addressing the court's emergency docket. It's just now we're slapping a label of class certification on it. So I would... And I'll make a second point on that and then say what I think the better way of approaching the problem is, which is I think that General Sauer and I are in agreement that the Venn diagram of cases that are appropriate for class certification and where injunctive relief, I think, would be appropriate is not coterminous. I think we could pursue successfully class certification here. I heard General Sauer to disagree, and I think it's because they're just different circumstances. If you look at the class certification requirements, commonality, typicality, they were actually added to Rule 23 in 1966, mostly to address the expansion of class certification to include damages suits. That makes sense there, but those were never requirements prior to 1966. Ms. Corcoran, on the class certification point you've been developing, one response might be, and I just want to get your reaction to it, that by proceeding through the class mechanism, even a putative class mechanism, a court is making a preliminary assessment about who are the parties going to be before it and issuing interim relief so that it preserves its jurisdiction to issue final relief with respect to those parties. And that's very different, the argument would go, than simply saying everybody, everywhere, nationwide, universally, or perhaps cosmically stands to benefit from this decision without ever having to suffer being bound by it. So I would say that's an ahistorical approach. You haven't had that sort of Rule 23. Assume for the moment that we read Bills of Peace, which I understand to be your best set of cases, to be prototypical of what is now Rule 23. Right, and so the Bills of Peace and kind of going through, as Mr. Fagenbaum was talking about, Equity Rule 48 and then 38, in none of those circumstances were we doing this ex ante class certification determination. So the modern class action device actually looks quite different than it was for representative suits historically. So it would be putting on an ahistorical constraint. I appreciate that argument, okay, but now we're haggling over the history, which we have to do, I accept. But if Bills of Peace are understood, again, except the premise, to be predecessors of Rule 23, then respond to the point that there is something fundamentally different about a preliminary injunction to a putative class you found is likely to be certified and likely to succeed on the merits in order to preserve that court's jurisdiction to award ultimate relief to those parties before it, and that that's categorically different than a universal injunction. So starting with the presumption that was different about the Bills of Peace is that they were binding, I think sometimes it's not clear always, at the end when they were getting to final judgment. I would go back to Grupo Mexicano, to Justice Barrett's point, although that was a high-water mark of this equitable originalism, the way the court articulated the test, it focused on 1789, but the actual analysis in Grupo Mexicano focused on 1890 through 1942. And what the court found there is that there were numerous cases expressly rejecting the Mareva injunction, and that was confirmed in the 1970s when England adopted it and said, no, we've never done this before. We are in an entirely different world here. One, the cases that Justice Sotomayor laid out earlier all come from between 1890 and 1942, and they suggest that non-party relief was provided for outside of the class action context. But the fact that we have, I think, these studied scholars in this rigorous debate about what the Bills of Peace meant, what the railroad cases meant, I think shows that this is very different in Grupo Mexicano. And for the court to kind of delve into that and adopt the categorical rule that the government is suggesting, I think is certainly an overcorrection. It's a hornet's nest on Article III, right? It calls into concern APA, class action, the whole sort of things. I would suggest that the court instead focus on providing limiting principles within the confines of the McKinn factors of the language. Is there a practical problem? So I want to put aside the history, and I take your points on that, and why you don't think Rule 22 fits, I take your point on that. But if putative class actions and preliminary relief are an option, what then is the practical problem you see as distinct from the current regime? Well, if General Sauer is right in that there are class certification problems here, then in this particular case, you're going to have thousands of... Okay, I think you would be arguing that the class should be certified here. Right, but I'm saying the government is... So more generally, taking that out of this case, if you could, do you see practical problems? Yeah, it would eliminate the associational standing trade cases, cases brought by the Chamber of Commerce, the NRA, other associations that aren't suitable for class certification. I think also the questions again... Can you explain that? Well, they wouldn't... So if we were to be on behalf of our individual plaintiffs, for the same reason that the government would have difficulty seeking class certification, state government, I think associations are not necessarily a good fit for that framework. Again, that's also not solving the court's problem. It's just channeling the problem through a different mechanism. I don't think that can be solved, just to be honest, but that's a separate issue from what the right rule is as to how things transpire in the district courts. Could I perhaps try to solve it in a different way? What I would suggest... We spent some time trying to catalog the cases in which this court has approved universal injunctive release and the cases in which it's rejected it with the aim of giving the court maybe a suggestion on how it might affirmatively articulate some limiting principles such that you would not be getting the injunctions that the court thinks are inappropriate, but the ones that the court has approved would still be able to proceed. Again, that's not the categorical rule that the government is suggesting. I think roughly what the court has been doing is saying that universal injunctions are appropriate only in facial challenges involving fundamental constitutional rights where there are real concerns about whether the legal and practical availability of relief to similarly situated parties who are also going to experience irreparable harm. I think that maybe explains AARP. Most recently, IRAP would fall into that category. Christophus, the New York eviction case, would fall in that category. On the other side of the ledger, the court seems to disapprove quite a bit of nationwide injunctions involving discretionary benefits. That's one of the recent ones that you have undone or stayed. So I think what the court could do is identify limiting principles that would provide guidance to the lower courts on when it's appropriate to issue these injunctions. A natural home for that is the public interest problem of the winter test. If you're going to issue an injunction that's going to have an impact on other people, you need to be doing a really muscular public interest assessment before doing that. So that's what I would urge the court to do. Ms. Corcoran, are you pushing back on the class certification idea because you're worried that there are cases where there will be no certification but in which broad relief is in fact appropriate? So that the two categories don't line up. And if that's why you're pushing back, why are you worried about that? What are the cases you're worried won't line up properly in that way? I mean, the government has suggested it's going to argue that here. Again, I think the commonality, so thinking about questions like common injury make a lot of sense when you're talking about class-wide damages, less so when you're talking about a facial challenge to a constitutional violation. So I think it's a bit of a mismatch. And again, it's not what Rule 23 was ever intended to do. And it doesn't solve any of the court's policy problems. So I think it's a lose-lose-lose proposal that the government is offering. I'm a little concerned that I have focused a lot on my amici hat and haven't actually explained to the court why the injunction is necessary for complete relief here. But I don't want to pivot too quickly, but I want to make sure I address our primary argument as well. Tell us why it's necessary for complete relief. Thank you. For two reasons. The first is that a plaintiff-specific injunction would not be administratively workable. I'll explain that in a second. But I want to note the second one is that even if it were workable, it would require the association members to identify and disclose to the government an association that puts them at great risk of adverse consequences, detention or deportation, even if they're here lawfully. And so it's not complete relief to require the plaintiff to make dangerous disclosures in order to claim that constitutional right. And then maybe I'll pivot back to the workability and answer questions about that. So I'll... I'm sorry. Very briefly, and then we'll move on to the next stage of our questioning. So the government's workability argument with respect to the individual plaintiffs, the private plaintiffs, is wholly tethered to its argument that the injunction should be limited to the 16 named plaintiffs. It has offered no argument for how it would administer, how states and local agencies could administer an injunction that was narrowed to the ASAP and CASA members. So I think that's probably the end of the road. Mr. Fagenbaum made the point that they can always go back to the district court and ask for the injunction to be dissolved if they present some sort of workable proposal. They haven't, and I don't think they can. I don't want to talk for too long, but if anyone is interested, I'm happy to answer questions about why I think it's unworkable. Oh, I'm sure someone will be. Thank you, though, counsel. Justice Thomas, Justice Alito. Should we decide or make up our minds on the underlying birthright citizenship question without briefing and argument and deliberation? I think that we would be very eager to do supplemental briefing on that. General Sauer noted that none of the parties had asked for cert before judgment. We couldn't because we keep winning. I will ask right now for cert before judgment. What's the answer to my question? Yes, I think you can grant cert before judgment. No, that wasn't my question. But I will say – All right, that's all right. You don't want to answer it then. No, no, I will, if I could give an answer, which is that I think it's very difficult, if not impossible, for the court to do a meaningful in-kin analysis without taking into account the fact that the government is asking the court to allow it to ignore this court's precedent, to ignore a duly enacted statute, and to upend 100 years of executive branch practice. So I think, you know, although the government has attempted to separate them, really the merits are embedded in the in-kin factors. Justice O'Meara. I find it hard to understand how a district court, in looking at a preliminary injunction under the winter factors, where we said that the likelihood of success on the merits is the keystone, how we could separate that out and say the keystone of whether you're entitled to universal injunction is the only merits question because the other factors are not eliminated by winter. You have to balance the equities, and you can't balance the equities without the merits, correct? I think that's right. I think also, you know, irreparable harm is going to be very difficult for the government to prove if it's not contesting, or at least not defending the constitutionality of the order because the government has no interest in enforcing an unconstitutional order. I'd also note there's a quote from Professor Bray in Justice Gorsuch's Texas Concurrence, and it's, In equity it all connects. The broader and deeper the relief the plaintiff seeks, the stronger the plaintiff's story has to be. So I think there really is kind of an equitable consideration here of the merits as well that just can't be extracted from the. Now the status explains why it can't pursue class actions. So it really admits it's limited to whether it's entitled to complete relief. But how about your organization? You sort of answered it, but I wanted to pin you down on that. Do you believe that associational organizations can seek class action? I believe our individual plaintiffs certainly can. Yes, there's no question. I am nervous about the government's suggestion that it's going to oppose our class certification motion if we were to file one. I think class certification can be very discovery intensive. It could be the sort of thing that really delays our plaintiffs from getting the relief that they seek. Thank you. Mrs. Kagan? I guess what I worry about here, Ms. Corcoran, is that this case is very different from a lot of our nationwide injunction cases in which many of us have expressed frustration at the way district courts are doing their business. And the typical way in which that frustration emerges is that questions, legal questions are hard and they're complicated, and different courts would decide them differently. And instead, because of the forum selection process, a party goes to one place, you know, in the first Trump administration, it was all done in San Francisco. And then in the next administration, it was all done in Texas. And there is a big problem that is created by that mechanism. And that leads to the questions to you and to General Feigenbaum, which is like, you know, your third buckets, which are, oh, if it's like super important, or if it's quintessentially national, or whatever the way, you know, is not going to solve our problem for that set of cases, which is not this case. This case, what's problematic about it, is that the courts keep deciding the same way. And nobody really thinks that the lower courts are going to do anything different. And, you know, for that reason, it does present the catch-me-if-you-can problem that Justice Jackson said, and the problem of how are we ever going to get a case here. But our general case is not like that. And I just want you to sort of comment on that.  First, the government's proposal of channeling for Rule 23 does nothing to solve anything you just described. I think the limiting principles that I was proposing, which again was just me trying to reflect back to the court, and the through lines that it's been identifying, are sufficiently concrete that if this court were to articulate them, it would cut back on the number of universal injunctions. Is it a facial challenge? Does it involve a fundamental constitutional right? Those are concrete questions. And then I would point to Justice Kavanaugh's poll concurrence. I think vertical stare decisis is going to be important here. When courts enter these sorts of injunctions, they are immediately appealable to the courts of appeals. So if there are any district courts that are kind of getting over their skis on these, it's correctable by the courts of appeals. Justice Gorsuch? Justice Kavanaugh? Some of your concerns about this court being involved, because I'm not sure I really understand that, when a president or an administration enacts some major new rule, the question ultimately, and it's legally challenged, ultimately it will be a year or two from now, they'll get here and we'll make a final judgment. But the interim status of that rule, as this case illustrates, and many others, vaccine mandate, eviction moratorium, go down the list, they're really important whether they're in effect for that year or two. And I guess I don't know why you should be concerned or we should be concerned about this court playing a role in this. Oh, I don't have concerns about that. I was responding to General Sauer's point that this has become pathological in the number of universal injunctions that are making its way onto the court's emergency docket. Just because there are more significant executive actions over the last three decades. I certainly agree with that. That are, you know, like the Loper-Bright and our West Virginia v. EPA are arguably some part of that story as well. I agree completely and to answer the question you asked General Sauer earlier about why we've seen this proliferation of these universal injunctions, I think it's directly, I would say first that the government, I think, pretty dramatically overstates them, it's double counting TROs and PIs in the same case. But if you look at the number of executive actions in the first six weeks of this administration, it's more than any other president issued in a year dating back to 1951 during the Korean War. But I don't want to sing, I mean, you know, it's going back, it's bipartisan phenomenon, completely bipartisan and completely, in my view, well-intentioned because presidents want to get things done and I get that. Yeah, I agree with that. I think it's directly correlated to the number of unilateral executive actions we've seen over the last few years. Justice Barrett. Mr. Corker, I just have one question. You said that you're in bucket one, so you felt like you were playing kind of the amici role. I understand why you might think you're in bucket one for the associational point. Do you think you're in bucket one for individual plaintiffs? So I don't know that I would extract them because the, you know, Well, named plaintiffs, like let's imagine you had individual plaintiffs that are named members of the association. So I guess what I'm saying is let's take the association outside of it and let's just say that we're talking about individual plaintiffs. So there I would go to the second injury I had identified earlier, which is if you're asking are individual plaintiffs have pseudonyms right now, that would be contemplating a scenario where they would have to identify themselves to the federal government and say I am an ace or I am the plaintiff in this case, at which point they are immediately vulnerable to deportation, even again if they're here lawfully. We've seen the government removing visa holders and asylum seekers. Justice Jackson. So I think I understand your argument. There's just one little piece of it that is confusing to me, and I hope you can clarify. So if we view the relief in this case and others like it to be a judgment, ordering the defendant not to do something that the court has found to be likely, because we're in the interim stage, unlawful, are non-parties in that situation actually getting relief or are they just incidental beneficiaries of an order requiring the government not to do this harmful thing? I thought it was the latter. And that just, you know, the government is told by the court don't do X. And, of course, anybody who would have been harmed by the government doing X is benefited by that, but they're not really, I thought, getting relief. But here's where I get confused because I thought they're not getting relief because they can't come into court independently and seek a contempt ruling if the government continues to do the thing. They weren't parties. They don't have the judgment. That's what differentiates them from, say, the class action people or the plaintiff people. The reason why we have the rules for class action, et cetera, is because at the end of the day the members of the class are getting a judgment that they can then use to enforce this obligation as against the government, whereas the people in the universal injunction world are just benefiting if the government actually, you know, follows the order. Yeah. I think that what you're articulating is consistent with a long history of precedent and practice. I mean, it's the classic REM case, right, making a declaration about property. I think Professor Fander's amicus brief is really helpful on that. He talks about the patent laws. And I think you can see that same instinct in the courts, cases that Justice Sotomayor was talking about earlier, right, the railroad rates, Barnett, Pierce v. Society of Sisters. I guess my point is that's why we don't need Rule 23 because we're actually doing conceptually a different thing. We're not trying to give all these people, everyone in the world, some sort of enforceable right as against the government. We are simply just doing what courts do, I thought, which is telling the defendant over whom they have personal jurisdiction that they have to stop doing something unlawful. And, of course, that benefits people. But the thing that confuses me about your argument is that you alluded at the beginning to Rule 71 and suggested that the non-parties could somehow enforce this universal injunction. I didn't understand. I think Rule 71 contemplates that. It would be very onerous. I mean, I think when General Sauer, he was kind of contemplating the idea that, you know, Right, but I think if you're right about that, it undermines the point that I'm making because it puts people in the same place as the class action folks and the parties in a way that I think raises legitimate concerns that some of my colleagues have put forward with respect to universal injunctions. So the thing that distinguishes them is that universal injunctions are not benefiting or giving relief to non-parties in any meaningful sense, is my theory. I think both have always been true, and maybe they're in tension with each other, but Rule 71 originated in Equity Rule X, which was put in place in 1842, which had the same idea of quite apart from representative suits, non-parties enforcing orders that provided them with relief. Although maybe this, as I'm talking, I think maybe I'm talking about under Rule 71, orders that provide relief. You're talking about injunctions. Yes. What I'm asking you is, in this very case, if we have a series of plaintiffs, of actually named people, and they get an injunction, as the government says, against, sorry, if they get a universal injunction or what they call a universal injunction, the government cannot enforce this executive order. Can someone who is not a non-plaintiff come into court to enforce that if the government violates it? So I'm hesitant to say no, both because Rule 71 exists and my clients are my plaintiffs and we needed this universal injunction. Yes, I understand. I'm just trying to figure this out. But I think both what you said is true. If we look at cases like Barnett and Pierce and we go all the way back, I think Justice Story's dissent that he signed on to in Cherokee Nation v. Georgia is terrific on this point. He was the preeminent scholar on equitable remedies, and he certainly thought in the way that you're articulating we are going to make a declaration about whether Georgia can enforce its laws on Cherokee Nation property, and that is just a declaration of the law that will have an impact on everyone. But I'm hesitant to say that Rule 71 doesn't have any application. Thank you. Thank you, counsel. Rebuttal, General Sauer? Thank you, Mr. Chief Justice. The original meaning of the citizenship clause extended citizenship to the children of former slaves, not to people who are unlawfully or temporarily present in the United States. The merits arguments we are presenting to the lower courts are compelling. We cite, for example, a host of 19th century authorities that point out that domicile was the touchstone of noncitizens having their offspring treated as citizens in that context. That is consistent with Wong Kim Ark as well as with the slaughterhouse cases in Elk v. Wilkins and the suggestion that our position on the merits is weak is profoundly mistaken. And that kind of snap judgment on the merits that was presented in the lower courts is exactly the problem with the issue of racing to issue these nationwide injunctions. The Chief Justice correctly pointed out that this court, if it wishes to address the merits expeditiously, has many tools to do so. Cert before judgment is one possible tool. There are also others. But this court should also address the scope of remedy. The remedial question that's presented in the application, that is an extremely urgent question. And one of the reasons it's an extremely urgent question is the limiting principles that my friends on the other side have been offering have all proven to be completely ineffective to slowing the essentially flood or cascade of universal injunctions that we see in these cases. The states here have a unique issue that hasn't come up yet, but for the reasons we state in our application, they lack third-party standing very clearly under cases like Murthy and Haland and Katzenbach and Kowalski. So no injunction really should run to the states in this particular case anyway. And most fundamentally, the vision of the district courts that's reflected in the issuance of these nationwide injunctions is a vision of them as a roving commission to correct every legal wrong that they can consider and to exercise general legal oversight over the executive branch, which is what this court rejected in TransUnion. And for those reasons, we ask the court to grant the application. Thank you, counsel. The case is submitted.